## State of Texas v. Angelina County and C. H. Wallace, Tax Assessor-Collector.

No. 7810.   Decided April 23, 1941.
(150 S. W., 2d Series, 379.)

*Gerald C. Mann*, Attorney General, *Cecil C. Cammack, Geo. W. Barcus* and *Glenn R. Lewis*, Assistants Attorney General, for appellant, the State.

*Tom F. Coleman, Jr.*, County Attorney, and *James W. Peavy*, both of Lufkin, for appellees.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals, Section B.

This cause is upon certified questions from the Ninth Court of Civil Appeals, arising upon the construction of Senate Bill No. 89, special laws 1939, 46th Leg., p. 987, approved May 15, 1939, effective 90 days after adjournment, which, omitting caption, enacting clause, and immaterial words and phrases, and section 7, reads:

"Sec. 1. That from and after the effective date of this Act, the Assessor and Collector of Taxes for each of the Counties of Jasper, Sabine, San Augustine, Shelby, Trinity, Houston, Tyler, Angelina, San Jacinto and Walker, * * * shall ascertain the number of acres of land purchased or leased by the Federal Government in their respective counties and shall make a report under oath to the Commissioners Court of such county as to the number of acres * * * purchased * * * by the Federal Government in such county.

"Sec. 2. Upon the filing of said report, * * * with the Commissioners Court * * * the * * * Court of each County * * * shall at their regular annual meeting as a Board of Equalization in May of each year fix a valuation upon such lands; the valuation fixed * * * shall be the same as fixed by the * * * Board upon * * * similar adjoining lands, for taxation purposes (and) the said Court shall at the same time determine the amount of taxes that said County and precincts and districts has lost as a result of the Federal Government having purchased * * * said land.

"Sec. 3. The Assessor * * * shall make an itemized report * * * showing the valuation fixed by the Board * * * and the amount of the county ad valorem taxes that would accrue thereon, * * * were they not exempt by reason of purchase * * * by the Federal Government, based upon such valuation and fixed at the prevailing rate * * *. The Assessor * * * shall show in said report the total amount of county ad valorem taxes which

would have been assessed against all lands within said county owned * * *, and shall forward said report to the Comptroller of Public Accounts at Austin.

"Sec. 4. The Comptroller * * * shall upon receipt of such report check the same * * *, and if found correct, shall approve such report. The total amount of county ad valorem taxes which would have been assessed against the lands owned * * * by the Federal Government within such county, as shown by the report of the * * * Assessor * * *, and approved by the Comptroller, * * * shall be the measure of the amount of the * * * tax to be donated * * *, as hereinafter provided.

Sec. 5. There is hereby donated, and granted to each of the Counties * * * Angelina * * * all of the State ad valorem taxes necessary to reimburse said County for the loss sustained * * * and not to exceed this amount, levied and collected in each respective county for general revenue purposes upon property and from persons * * *, including the rolling stocks of railroads, or so much of such State ad valorem taxes collected as shall be equal to the amount to be determined in accordance with Section 4 hereof. The taxes hereby donated shall be levied and collected as now provided by law except that the Assessor * * * in each respective County shall forward his report to the * * * Comptroller * * * as provided by law, and shall pay over to the Treasurer of each respective county all moneys collected by him at the end of each month, except such amounts as are allowed by law for collecting and assessing the same; and shall forward a duplicate copy of the receipts given him by the County Treasurer for said money to the Comptroller.

"Sec. 5-a. The taxes herein donated * * * to the Counties herein are hereby allocated to the Commissioners Court of the respective counties * * * *to be used by said Commissioners for the purpose of carrying on the governing activities of the County, public improvements, and discharge of any County or Precinct indebtedness, and may be by said * * * Court allocated to any other political subdivision of the County which has sustained loss as a result of the Federal Government purchasing land within the said political subdivision.*

"Sec. 6. *It is expressly provided, however, * * * that if and when the Federal Government shall reimburse the Counties * * * for the amount of taxes lost * * *, this Act * * * shall, as to the County or Counties receiving such reimbursements, become null and void * * *, it being the purpose of this Act to relieve such Counties from loss until reimbursement occurs.*

* * * * *

"Sec. 8. The fact that the United States Government has

purchased * * * a large acreage of cut over lands in the Counties named * * *, thereby taking off of the tax rolls great valuations for taxable purposes in each of such Counties; and the fact that the loss of such taxable values * * * renders them incapable of carrying on county government and paying the expenses incident thereto; and the further fact that said Counties have not yet recovered from the disastrous results incident to the *calamitous occurrences herein above enumerated* create an emergency, etc." (All italics ours.)

The certificate recites that on May 2, 1933, the Legislature approved a concurrent resolution whereby it resolved, upon the recitations that the federal government owned no national parks or national forests in the State, and that many citizens were urging the federal government (in order to assist the unemployment situation) to establish national parks and forests in the State, and to purchase various tracts of land in the State and resell same to citizens, that the State consent for the federal government to purchase lands in Texas for either of the purposes mentioned.

The certificate recites that the Legislature by the above special act donated, *without limitation as to time,* sufficient State ad valorem taxes to reimburse the counties named, including Angelina, for the loss sustained on account of the purchase * * * of lands within their respective boundaries; and that the tax assessor of Angelina County and its commissioners' court complied with the provisions of the act necessary to entitle it to the donation of the State taxes as provided; that the assessor's report disclosed that the federal government had purchased *in that county* about eighty square miles of land; that in May, 1939, the court met as a board of equalization and fixed the taxable valuations of this land for the years 1936-39, and that the report of the assessor disclosed the tax rate for these years; and that the tax losses for Angelina County were as follows: $3,595.02 for 1935; $2,737.74 for 1936; $2,765.40 for 1937; $2,765.40 for 1938; and $2,627.13 for 1939.

It appears from the certificate that this suit was filed on the 3rd day of January, 1939, by Angelina County against C. H. Wallace, its tax assessor-collector, in which the facts are pleaded generally as stated above, and in which it is prayed that the defendant be restrained from remitting to the comptroller and treasurer of the. State the money now in his hands and claimed by the county as a donation under the act. It appears that a temporary injunction was granted plaintiffs, pending a hearing on the merits.

It further appears that the State through Hon. Gerald C. Mann, its attorney general, intervened, challenging the constitutionality of the act on the eight grounds reflected in questions herein certified, presently to be stated.

It appears that the State prayed that the act be declared void, that the injunction sought by plaintiff be denied, that defendant be perpetually enjoined from acting under the provisions of the act from violating the requirements of Articles 7254, 7260, and 7294, Revised Civil Statutes, and from delivering to the county or its treasurer any part of the State's ad valorem taxes heretofore or hereafter collected by him, and that a mandatory injunction issue requiring the defendant to deliver such taxes to the State treasurer as provided in said articles and other applicable revenue laws of the State.

The certificate further recites that the evidence established the fact conclusions stated above, and that the court found the acreages contemplated by the act were not purchased prior to January 1, 1935, but prior to January 1, 1936; that judgment was entered directing Wallace, the county assessor, to release to the treasurer of the State $3,595.02, being the amount claimed by the county as its tax loss for 1935, enjoining him from paying into the treasury of the State the tax losses for 1936, 1937, 1938, and 1939, amounting to the sum of $10,895.67, and directing that this sum be allowed to proceed into the treasury of the county as provided by the act; and that all affirmative relief prayed for by the State be denied, and that the county have and recover from the defendant and intervenor all costs in this behalf expended; and that from the judgment the State duly prosecuted its appeal to the Court of Civil Appeals.

On the certificate, accompanied by a tenative per curiam opinion, the following questions were certified:

1. "Does Senate Bill No. 89 violate Sec. 9, of Art. 8 of the State Constitution, within appellant's proposition 'that it attempts to authorize the transfer of State ad valorem tax funds, which belong or should belong to the general revenue fund of the State of Texas and which should be used in the operation of the state government, to the various counties named in the act to be used for county purposes'?"

2. "Does Senate Bill No. 89 violate Sec. 6, of Art. 8, of the State Constitution within appellant's proposition 'that same attempts to make an appropriation of State moneys for a longer period than two years'?"

3. "Does Senate Bill No. 89 violate Sec. 6, Art. 8, of the State Constitution within appellant's proposition 'that same does

not make a specific appropriation, the amounts granted to the respective counties not being certain and being left to the various commissioners courts to determine'?"

4. "Does Senate Bill No. 89 violate Sec. 1, of Art. 2, and Sec. 1, of Art. 3, of the State Constitution and, under these provisions of the Constitution, does Senate Bill No. 89 fall within the term of appellant's proposition 'that same attempts to delegate to the Commissioners Courts of the various counties named in the Act legislative powers, to wit, power to determine the amounts of moneys to be granted to said counties from year to year under said purported Act, to determine the uses to which the same may be put, and to allocate the same to various and sundry political subdivisions in whatever amount or proportion and for whatever purpose or purposes such Commissioners Courts may desire'?"

5. "Does Senate Bill No. 89 violate Sec. 1, of Art. 8, of the State Constitution, requiring taxation to be equal and uniform, within appellant's proposition that 'the necessary operation of the same being to tax property and inhabitants elsewhere in the State heavier than in the counties named in the Act for the purpose of operating the State government'?"

6. "Does Senate Bill No. 89 violate Sec. 3 of Art. 1, of the State Constitution, within appellant's proposition 'that same constitutes class legislation, granting to the respective counties named in the Act and their inhabitants exclusive public emoluments and privileges not in consideration of public service.'?"

7. "Does Senate Bill No. 89 violate Sec. 51 of Art. 3, of the State Constitution, within appellant's proposition that it is 'in effect a grant of public money to the inhabitants of the counties named in the Act'?"

8. By its terms, is Senate Bill No. 89 retroactive so as to include within its grant and donation to the counties named in the Act the tax losses sustained by them for the years 1936 to 1939?"

The Court of Civil Appeals holds in its tenative opinion that while the act is good as against all of the objections interposed by the State, except one, it is void because violative of section 1 of Article 2, and section 1 of Article 3 of the State Constitution, in that it attempts to delegate legislative powers to the commissioners' courts.

We deem it necessary under our view of the case to answer only questions 2 and 3, which inquire whether the legislative act is violative of section 6 of Article 8 of the Constitution.

The section omitting the concluding exception, which is not material here, reads:

"No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law; nor shall any appropriation of money be made for a longer term than two years; * * *."

■ It is unnecessary to discuss at length the provisions of the act since in our opinion section 5, the donating section of the act, is void because violative of that provision of section 6 of Article 8 of the constitution which inhibits a legislative appropriation for a longer term than two years. See reasons stated in Dallas County v. McCombs, 135 Texas 272, 140 S. W. (2d) 1109. Furthermore, it appears from that section of the act (sec. 6) dealing with the duration of the period for which appropriations are to be made, that the appropriations will cease only upon the uncertain contingency of whether the federal government may at some future time reimburse the counties for the amount of taxes lost by virtue of the sales by them of their respective lands. The donating section of the act is void also because violative of that provision of section 6 of Article 8 which prohibits the drawing of money from the State Treasury upon other than "specific appropriations." National Biscuit Co. v. State, 134 Texas 293, 135 S. W. (2d) 687. As stated in the Biscuit Company case, just cited, the appropriation "is indefinite as to amount, or even as to a maximum amount, leaving that matter, not to the Legislature, but to another branch of the government, the courts to determine." The Commissioners' Court to which the Legislature appears to have delegated the matter of fixing the amount of taxes to be reimbursed (secs. 2, 3, and 4 of the act), is restricted, not by a standard that will yield a fixed amount, but by a standard under which the amount will vary as either the rate of the levy, or the valuation of the land, varies.

It is apparent from what has been stated that questions 2 and 3 should be answered in the affirmative, unless the act is not controlled by section 6 of Article 8 of the Constitution because of the matters presently to be discussed.

The fund in question is not brought from under the control of section 6 of Article 8 by that provision of the act (sec. 5) directing its payment into the county treasury direct in-

stead of into the State treasury and from there into the county treasury, since the character of the fund (general fund) is not thereby changed; nor are the appropriations provided by the act exempt from the terms of section 6 because, as contended by the county, the donation in general is authorized by Article 16, section 59a, of the Constitution as a conservation measure.

The creation of no district is provided by the act as a medium through which the work of conservation is to be carried on, and the act generally does not have any of the earmarks of conservation legislation. In fact the purpose appears to be to donate funds to replace a loss of taxes rather than provide funds to be used for forest conservation by the State.

■ It is contended by the county that the legislative act in question is authorized by section 51 of Article 3 of the Constitution, the "calamity" provision; and that, as such legislation, the act is not controlled by the constitutional provisions discussed, or any of the other provisions invoked by the Attorney General in his brief.

The contention proceeds upon the view, as contended by the county, that the Legislature "has required" of the counties named in the act that they "perform a public service"; that the federal government in purchasing the lands did so "pursuant to the authority granted" by senate concurrent resolution No. 73, supra; that when title to the land was vested in the federal government it was thereby removed from the realm of taxation, and that the Legislature found that the loss of taxable values entailed by the purchase rendered the counties incapable of paying the expenses incident to carrying on their respective county governments.

We overrule this contention. In fact, consent on the part of the State is not a necessary prerequisite to a purchase of lands within the State by the federal government for any purpose it deems advisable. Curry v. State, 111 Texas Crim Rep., 264, 12 S. W. (2d) 796; Dodson v. Home Owners Loan Corporation, 123 S. W. (2d) 435.

Be that as it may, the resolution referred to, which was passed (May, 1933) some two years prior to the sale of the lands, contained no element of compulsion, and went no further than to express consent for the federal government to purchase lands in the State for the purposes therein stated in the event it desired to do so. So far as the resolution is concerned, the sale by Angelina County of its lands was wholly voluntary. While the act refers in the emergency clause (which did not pass) to the loss of taxable values in the counties named

as "calamitous occurrences," it is apparent upon the face of the act as a whole that it does not purport to make provisions for the relief of a "public calamity" within the meaning of Article 3, section 51, of the Constitution. Public calamities heretofore recognized by this Court as such within the meaning of this section of the Constitution have been due to occurrences involuntary in their nature, so far as the localities upon which they were visited were concerned. We are not disposed to so extend the meaning of the term "public calamity" as used in section 5, as to include an occurrence such as the present, which came about as the result of the voluntary act of the county in disposing of its forest lands.

We are not to be understood by what has just been stated with reference to calamities, as holding that the Legislature is lacking in authority to render aid to the counties named in the act in connection with their respective losses of taxable values, but merely that such losses are not within the "calamity" provision of the Constitution.

It is apparent from what has been stated that we hold questions two and three should each be answered in the affirmative, and we so certify.

It is unnecessary to a disposition of the case that we answer the other questions.

Opinion adopted by the Supreme Court April 23, 1941.